UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DONNEITA MORGAN,

                  Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of
 Social Security,

                  Defendant.
_____

**REPORT
and
RECOMMENDATION**

**11-CV-1009A(F)**

APPEARANCES:       LAW OFFICES OF KENNETH R. HILLER
                        Attorneys for Plaintiff
                        JAYA ANN SHURTLIFF, of Counsel
                        6000 N. Bailey Avenue
                        Suite 1A
                        Amherst, New York 14226

                        WILLIAM J. HOCHUL, JR.
                        UNITED STATES ATTORNEY
                        Attorney for Defendant
                        MICHAEL S. CERRONE
                        Assistant United States Attorney, of Counsel
                        Federal Centre
                        138 Delaware Avenue
                        Buffalo, New York 14202, and

                        STEPHEN P. CONTE
                        Regional Chief Counsel - Region II
                        JEREMY A. LINDEN
                        Assistant Regional Counsel
                        United States Social Security Administration
                        Office of the General Counsel, of Counsel
                        26 Federal Plaza
                        Room 3904
                        New York, New York 10278

## <u>JURISDICTION</u>

This action was referred to the undersigned by Honorable Richard J. Arcara on

January 24, 2012. (Doc. No. 5).  The matter is presently before the court on

Defendant's motion for judgment on the pleadings filed on June 22, 2012 (Doc. No. 10).

## BACKGROUND

Plaintiff Donneita Morgan ("Plaintiff" or "Morgan"), seeks review of Defendant's

decision denying her Disabled Widows Benefits ("DWB"),[1] and Supplemental Security

Income ("SSI") (together, "disability benefits") under, respectively, Titles II and XVI of

the Social Security Act ("the Act").  In denying Plaintiff's application for disability

benefits, Defendant determined Plaintiff has the severe impairments of degenerative

disc disease, degenerative joint disease, left shoulder cuff tendonitis, asthma and

obesity, but does not have an impairment or combination of impairments within the

Act's definition of impairment.  (R. 19).[2]  Defendant further determined Plaintiff had the

residual functional capacity to perform light work within twelve months of the alleged

onset date of December 9, 2008, that Plaintiff was capable of performing past relevant

work as a data entry clerk and office helper (R. 23), and that even if Plaintiff's medically

determinable impairments could reasonably be expected to produce Plaintiff's alleged

symptoms, their alleged persistence and limiting effects were not credible to the extent

inconsistent with Plaintiff's residual functional capacity assessment.  (R. 20).  As such,

Plaintiff was found not disabled, as defined in the Act, at any time from the alleged

onset date through the date of the Administrative Law Judge's decision on May 11,

2011.  *Id.*

---

[1] That Plaintiff meets the non-disability requirements for DWB is not disputed.

[2] "R" references are to the page numbers of the Administrative Record submitted in this case for the Court's review.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits on October 29, 2009 (R. 156), alleging disability based on neck pain, lower back pain, and pain in Plaintiff's left shoulder, arm, hand, knee, leg and foot as a result of an accident Plaintiff suffered on December 9, 2008, Plaintiff's alleged disability onset date. (R. 201). The applications were initially denied by Defendant on December 22, 2009. (R. 70-72). Pursuant to Plaintiff's request, filed February 5, 2010 (R. 82), a hearing was held before Administrative Law Judge David S. Pang ("Pang" or "the ALJ") on April 11, 2011, in New York, New York. (R. 27-59). Plaintiff, represented by Melissa Pezzino, Esq., ("Pezzino"), appeared and testified via video conference at the hearing.[3] (R. 27-59). Testimony was also given by vocational expert Kilpatrick ("Kilpatrick" or "the VE"). (R. 51-57). The ALJ's decision denying the claim was rendered on May 11, 2011. (R. 13-24).

On July 13, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 9). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on September 28, 2011. (R. 1-5). This action followed on November 28, 2011, with Plaintiff essentially alleging the ALJ erred by failing to find her disabled. (Doc. No. 1).

Defendant's answer, filed January 23, 2012 (Doc. No. 4), was accompanied by the record of the administrative proceedings. On June 22, 2012, Defendant filed a motion for judgment on the pleadings ("Defendant's motion"), accompanied by a

---

[3] Plaintiff appeared by video at the discretion of the Administrative Law Judge pursuant to 20 C.F.R. § 404.936(c).

memorandum of law (Doc. No. 11) ("Defendant's Memorandum").  Plaintiff filed on

August 22, 2012, Plaintiff's Memorandum of Law in Support of a Motion for Judgment

on the Pleadings and in Response to the Commissioner's Motion for Judgment on the

Pleadings (Doc. No. 12) ("Plaintiff's Memorandum").[4]  Oral argument was deemed

unnecessary.  Based on the following, Defendant's motion should be GRANTED.

## FACTS[5]

Plaintiff, Donneita Morgan ("Plaintiff"), was born on July 20, 1956, has a GED,

completed dental technician school, is widowed, lives with her family, and worked most

recently as a data processor from June 2008 until December 2008.  (R. 184).  Plaintiff

alleges she has suffered pain in her neck, lower back, left shoulder, left arm, left hand,

left knee, left leg, and left foot since December 9, 2008, when she was struck by a

vehicle while waiting at a bus stop.  (R. 201, 367).

Upon being struck by the vehicle, Plaintiff was taken by ambulance to the

emergency room at Buffalo General Hospital in Buffalo, New York, where Charles

Chung, M.D. ("Dr. Chung") completed an X-ray of Plaintiff's lumbrosacral spine that

showed normal results (R. 278), and a computerized tomography scan ("CT scan") of

Plaintiff's abdomen that showed possible internal hernia.  (R. 243).  An X-ray of

Plaintiff's left leg that same day showed no bony fracture, dislocation or sclerosis  (R.

245, 280), and upon discharge, Plaintiff was instructed to take Motrin for pain.  *Id*.

On December 14, 2008, Plaintiff returned to Buffalo General Hospital with complaints of

---

[4]Although Plaintiff's Memorandum indicates Plaintiff also seeks judgment on the pleadings,
Plaintiff has not filed an actual motion for such relief and the deadline to make such motion was June 22,
2012.

[5]Taken from the pleadings and the administrative record.

muscle ache, soreness, left knee pain, and left leg spasms and pain while walking that resulted in a limp.  (R. 367).  William R. Hampton, M.D. ("Dr. Hampton"), completed and reviewed an X-ray of Plaintiff's left knee that showed Plaintiff's soft tissue within normal limits and no evidence of fracture or dislocation.  (R. 242).

Plaintiff received chiropractic treatment from Geoffrey Gerow, D.C. ("Dr. Gerow") approximately 60 times between January 10, 2009, and February 1, 2010.  (R. 514-58). During the period between January 10, 2009 and February 1, 2010, Dr. Gerow provided Plaintiff's employer with a monthly report indicating that Plaintiff was "totally disabled with regard to all work," and referred Plaintiff for examination by Graham R. Huckell, M.D. ("Dr. Huckell") an orthopedic specialist.  (R. 535).

On January 19, 2009, Gurmeet Dhilion, M.D. ("Dr. Dhilion"), completed a magnetic resonance imaging ("MRI") scan on Plaintiff's left knee that showed bone marrow edema (swelling) in Plaintiff's medial tibial plateau (flat area of tibial bone) and diagnosed Plaintiff with an undisplaced subchondral fracture (bone fracture that remains in place).  (R. 248).

On February 19, 2009, Plaintiff visited Dr. Huckell, an orthopedic specialist, for a consultative examination.  (R. 471).  Upon examination and review of Plaintiff's X-ray taken December 14, 2008 (R. 242), Dr. Huckell opined the X-Ray revealed mild narrowing of the joint space of Plaintiff's left knee with no fracture or dislocation, and diagnosed Plaintiff with mild osteoarthritis.  (R. 473).

On February 28, 2009, Gregg I. Feld, M.D. ("Dr. Feld"), completed an MRI of Plaintiff's left shoulder that revealed tendinopathy (tendinitis) of Plaintiff's distal rotator cuff with no evidence of tear, and hypertrophic (abnormal enlargement) of Plaintiff's

acromioclavicular joint (joint at top of shoulder) ("AC joint") with mild impingement of Plaintiff's rotator cuff.  (R. 250).

On April 28, 2009, Randy Loftus, M.D. ("Dr. Loftus") completed an MRI of Plaintiff's cervical spine that showed slight straightening of Plaintiff's normal cervical lordosis (normal curve of the upper spine), central disc herniation of Plaintiff's C3-C4[6] vertebrae measuring less than 2 mm without significant foraminal stenosis (narrowing of the area where the nerve root exits the spine), broad based central/left paracentral disc herniation (protrusion type) of Plaintiff's C5-C6 vertebrae measuring 3mm that significantly impinged on Plaintiff's left anterior subarachnoid space, with moderate to mild bilateral foraminal stenosis.  (R. 254).  An MRI of Plaintiff's lumbar spine taken the same day revealed a diffuse disc bulge of Plaintiff's annulus fibrosus (protective disc coating) with slight asymmetry measuring approximately 2 mm mildly impinging on the anterior surface of the thecal sac (protective membrane surrounding spinal cord and nerves) of Plaintiff's L5-S1 vertebrae.[7]   (R. 251).  Dr. Loftus opined the findings of Plaintiff's MRI were consistent with a chiropractic diagnosis of vertebral subluxation (spinal misalignment), suspected a central annular tear, and recommended clinical correlation to aid in Plaintiff's further diagnosis.  (R. 252).

On May 20, 2009, Chiropractor Christopher Ferrante, D.C. ("Dr. Ferrante"), completed a chiropractic examination of Plaintiff's cervical spine, measured Plaintiff's

---

[6]C3-C4 and C5-C6 refer to numbered cervical spine discs. *See generally*, Nerve Root Impingement– a common back problem, *available at* http://www.spine-health.com/topics/anat/confusion/confusion03.html (last visited May 6, 2013).

[7]L5 refers to a numbered lumbar spine disc. S-1 refers to the sacral region of the spine. *See generally*, Spinal Anatomy and Back Pain, *available at* http://www.spine-health.com/conditions/spine-anatomy/spinal-anatomy-and-back-pain (last visited May 6, 2013).

bilateral deep tendon reflexes as +2[8] bilaterally, noted Plaintiff's physical examination revealed mild tenderness of Plaintiff's left trapezius (muscle at back of neck and upper thorax), and that Plaintiff exhibited normal range of motion to left lateral bending and right and left rotation. (R. 261). Upon examination, Plaintiff's lumbar spine measured 50 degrees (90 degrees is normal) on flexion with normal extension and lateral bending. (R. 261). Plaintiff's seated straight leg raise test was negative at 90 degrees on the right and 70 degrees on the left with left knee pain, and Plaintiff's supine position straight leg raising test was negative at 80 degrees on the right and 40 degrees on the left with pain. *Id*. Dr. Ferrante diagnosed Plaintiff with resolved cervical and lumbar sprains, opined there was no need for Plaintiff to enter chiropractic treatment, deferred treatment to an orthopedic specialist, and opined Plaintiff was capable of working without restriction. (R. 261-62).

On June 25, 2009, Chiropractor Gary R. Smith, D.C. ("Dr. Smith") completed a needle electromyography ("EMG") test of Plaintiff's upper and lower extremities that revealed chronic left C5-C6 radiculopathy (condition caused by a compressed nerve), with no evidence of lumbar radiculopathy, ploxopathy (nerve disorder), focal entrapment (compressed nerve), or diffuse neuropathy. (R. 266). Dr. Smith opined Plaintiff's compressed disc warranted further lumbar discography (invasive procedure used to evaluate disc pain) and recommended surgical consultation. (R. 266).

On August 28, 2009, Plaintiff visited Conrad R. Williams, M.D. ("Dr. Williams"),

---

[8]Deep tendon reflexes are categorized as "0" always abnormal, "1+" may or may not be normal, "2+" normal, "3+" may or may not be normal, "4+" always abnormal. *See generally*, Chapter 72 Deep Tendon Reflexes, *available at* http://www.ncbi.nlm.nih.gov/books/NBK396/ (last visited May 6, 2013).

an internal medicine practitioner, with pain radiating from the neck to left arm, low back pain radiating to both legs, headache, dizziness, right hand numbness, and crying spells as a result of pain. (R. 650). Upon examination, Dr. Williams diagnosed Plaintiff with cervical radiculopathy, cervical herniation, lumbar sprain, left shoulder tendinitis, and lumbar radiculopathy, and opined Plaintiff was temporarily totally disabled. (R. 651).

On September 23, 2009, A. Mark Tetro, M.D. ("Dr. Tetro"), an orthopedic surgeon, examined Plaintiff for left shoulder pain (R. 474), and upon examination, diagnosed Plaintiff with left shoulder posttraumatic tendinitis, possible rotator cuff tear, posttraumatic AC joint arthritis and neck pain. (R. 474-76). Dr. Tetro treated Plaintiff's left shoulder with a lidocaine injection, recommended a left shoulder MRI, and opined Plaintiff was totally disabled with regard to her usual occupation as a result of the injuries Plaintiff suffered from the accident on December 9, 2008. (R. 477).

On September 24, 2009, Dr. Huckell examined Plaintiff who complained of left-sided shoulder and lower back pain and daily headaches, and exhibited numbness, clumsiness, and paresthesias (prickly tingling sensation) of the left arm and fingers, and numbness and paresthesias of the left foot. (R. 480). Plaintiff rated her lower back pain as a 7 on a ten point scale with a constant dull ache and stiffness, and rated her left-sided neck pain as 8 on a ten point scale. *Id*. Dr. Huckell measured Plaintiff's cervical range of motion as 35 degrees upon flexion, 35 degrees upon extension, 30 degrees to left and right bending, and 45 degrees to left and right rotation. *Id*. Dr. Huckell measured Plaintiff's lumbar range of motion as 50 degrees upon flexion, 20 degrees upon extension, 20 degrees to left and right bending, and 35 degrees to left

and right rotation.  *Id*.  Plaintiff exhibited full range of motion of the shoulders, elbows, wrists, hips, knees, and ankles, with upper right extremity strength rated as 5 on a five point scale, upper left extremity strength of 4 on a five point scale, right grip strength of 60 pounds, left grip strength of 10 pounds, and reduced left finger grasp strength.  *Id*. Plaintiff's supine straight leg raising test measured 75 degrees on the right and 45 degrees on the left, with normal distal tendon reflexes of the knees, ankles, and upper extremities.  *Id*.  Plaintiff was able to stand on her heels and toes, walked with a limp, and used a cane as an assistive device on occasion.  (R. 481).  Dr. Huckell opined that surgery was necessary to treat Plaintiff's cervical spine impingement, that no surgery was necessary to treat Plaintiff's lumbar spine, and expressed a concern that Plaintiff may have postconcussive syndrome from the accident on December 9, 2008.  (R. 486). Dr. Huckell noted a slight asymmetry to Plaintiff's smile with mild left side pronator drift, opined that Plaintiff's mild deficits of executive functioning and memory required further neurological evaluation, and diagnosed Plaintiff as disabled.  *Id*.

On October 23, 2009, David E. Hoffman, M.D. ("Dr. Hoffman"), a neurologist, completed a neurological examination of Plaintiff that showed normal results.  (R. 466-67).  A brain CT scan ordered by Dr. Hoffman also revealed normal results.  (R. 470). During a visit to Dr. Williams that same day Plaintiff exhibited neck, shoulder and back pain with muscle spasms.  (R. 661).  Plaintiff rated her back pain as a 10 on a ten point scale, walked with a limp, grimaced and winced from pain, and told Dr. Williams that the pain in Plaintiff's back caused Plaintiff to sleep on the sofa.  *Id*.  Dr. Williams diagnosed Plaintiff with lumbar neuritis (nerve inflammation), neck sprain/strain and increased Plaintiff's prescription for neurontin (pain medication) from 300 mg to 600 mg.  (R. 663).

On November 23, 2009, Dr. Tetro performed left shoulder rotator cuff surgery on Plaintiff that revealed normal articular surfaces, a torn glenoid labrum (socket joint of shoulder), rotator cuff tendonitis without tear, moderate to severe posttraumatic subacromial bursitis (inflammatory condition of shoulder) and posttraumatic disruption of Plaintiff's AC joint ligament. (R. 603). Plaintiff's shoulder surgery included repair to Plaintiff's rotator cuff tear, and subacromial decompression to remove inflamed bursal tissue from Plaintiff's shoulder and a bony spur from Plaintiff's clavicle (collarbone). (R. 604).

On December 10, 2009, on behalf of the Office of Disability Assistance, Samuel Balderman, M.D. ("Dr. Balderman"), completed an orthopedic examination on Plaintiff that showed full flexion, extension, lateral flexion and bilateral movement of Plaintiff's cervical spine, full hand and finger dexterity, and full range of motion of Plaintiff's right shoulder. Plaintiff's left shoulder elevation measured 60 degrees with no inflammation, effusion or instability, full flexion, extension, and lateral flexion of Plaintiff's lumbar spine, and a marked limitation in Plaintiff's ability to reach, push, and pull related to Plaintiff's recent shoulder surgery. (R. 503-05). Dr. Balderman opined that any symptoms as a result of Plaintiff's shoulder surgery should resolve within a four-month period following the surgery. *Id*. An X-ray of Plaintiff's lumbar spine taken the same day showed no abnormality. (R. 506). An X-ray of Plaintiff's left knee the same day showed no acute fracture, destruction or bony lesions and "relatively well maintained" joint spaces. (R. 507).

Plaintiff received physical therapy treatment on Plaintiff's left shoulder with Physical Therapist Matt Clemens ("P.T. Clemens") on December 10, 2009 (R. 610),

December 21, 2009 (R. 613), January 4, 2010 (R. 614), January 6, 2011 (R. 615), and January 14, 2010. (R. 616).  On July 28, 2009, P.T. Clemens noted Plaintiff reported 40% improvement in symptoms since starting therapy.  (R. 579).

On January 5, 2010, Plaintiff returned to Dr. Williams with complaints of left shoulder pain, neck pain, back pain and muscle spasms  (R. 664), and Dr. Williams noted Plaintiff was taking six Lortab per day for pain and was unable to sleep because of the pain in Plaintiff's shoulder, back, and neck.  *Id*.  Upon examination, Dr. Williams noted Plaintiff was in obvious discomfort, with facial grimacing, wincing and groaning as a result of pain, and that Plaintiff exhibited extreme pain on slight palpation of Plaintiff's left shoulder, limited active and passive range of motion of the left shoulder with swelling and tenderness, and that Plaintiff was not able to perform a bilateral heel and toe walk.  *Id*.  Plaintiff's medications included neurontin (nerve pain), baclofen (muscle relaxant), lortab (pain), nucynta (pain medication) and an electrical stimulator for pain treatment at home.  (R. 665).

On January 15, 2010, Dr. Tetro completed a postoperative examination of Plaintiff who exhibited significant improvement of left shoulder range of motion and strength, and reviewed an X-ray of Plaintiff's left shoulder that showed changes consistent with the expected surgical results.  (R. 619).  Dr. Tetro opined Plaintiff was totally disabled with regard to her usual work as a data entry clerk.  *Id*.

On January 25, 2010, Plaintiff returned Dr. Huckell with neck pain, numbness, neck paresthesias, clumsiness of the left hand and fingers, and daily headaches.  (R. 622).  Plaintiff reported no loss of balance or coordination while walking, and was able to walk with a steady gait and stand on her heels and toes.  *Id*.  Dr. Huckell measured

Plaintiff's cervical range of motion as 35 degrees upon flexion, 35 degrees upon extension, 30 degrees to right bending, and 40 degrees to left bending. (R. 524). Plaintiff's lumbar range of motion measured 50 degrees upon flexion, 20 degrees upon extension, 20 degrees to right bending, and 20 degrees to left bending. *Id*. Upon a negative seated straight leg test, Dr. Huckell expressed concern that the results of Plaintiff's April 28, 2009 MRI may have been flawed as a result of movement during the procedure, referred Plaintiff for a second cervical MRI, and opined Plaintiff remained disabled. (R. 624).

On February 5, 2010, Joseph Serghany, M.D. ("Dr. Serghany"), completed an MRI scan of Plaintiff's cervical spine that revealed a small focal central protrusion minimally effacing the anterior subarachnoid space of Plaintiff's C3-C4 disc space with no central or foraminal stenosis, mild broad-based posterior disc protrusion partially effacing the anterior subarachnoid space of Plaintiff's C5-C6 disc space with slight left posterior ridging, and mild hypertrophic changes of Plaintiff's left uncovertebral joint encroaching and mildly narrowing Plaintiff's left neural foramen. (R. 636).

On February 9, 2010, P.T. Clemens prescribed a cervical traction unit for Plaintiff's home use. (R. 639). A visit to Dr. Huckell that same day showed Plaintiff with a steady gait (R. 632), while a visit to Dr. Tetro showed Plaintiff with improved left shoulder motion and strength. (R. 628).

On February 12, 2010, Plaintiff returned to Dr. Williams with extreme left shoulder pain on slight palpation with swelling and tenderness, very limited active and passive range of motion of the left shoulder, diminished range of neck motion with pain and tenderness, irritability, anxiety and sadness, back spasms, and difficulty sleeping.

(R. 667-68). Dr. Williams noted that Plaintiff was not able to perform a heel and toe

walk, that Plaintiff was in moderate distress, and diagnosed Plaintiff with lumbar

neuritis, cervicalgia (neck pain), neck sprain or strain, brachial neuritis, anxiety and

depressive disorder. (R. 668). Dr. Williams discontinued Plaintiff's baclofen (muscle

relaxant) prescription, prescribed diazepam (Valium) for Plaintiff's anxiety and spasms,

and opined Plaintiff was 100% temporarily impaired. (R. 669). On March 12, 2010, Dr.

Williams assessed Plaintiff with neck pain, left shoulder pain, back pain, diminished

range of motion of Plaintiff's neck, and left knee pain as a result of altering posture to

alleviate back pain. (R. 670). Dr. Williams noted Plaintiff was unable to perform a

bilateral heel and toe walk, that Valium helped to alleviate some of Plaintiff's symptoms,

and assessed Plaintiff as 100% temporarily impaired. (R. 671-72). On April 13, 2010,

Dr. Williams noted Plaintiff continued to experience neck, left shoulder and back pain,

that pain medication was helping alleviate some of Plaintiff's neck pain, but that

Plaintiff's knee pain was getting worse. (R. 673). Dr. Williams opined Plaintiff's

complaints of pain were consistent with the injuries Plaintiff suffered on December 9,

2008, assessed Plaintiff as 100% temporarily impaired, and noted Plaintiff's toxicology

report showed positive results for cocaine and Valium. (R. 676). Dr. Williams noted

Plaintiff exhibited irritability, sadness, and anxiety with normal affect, and discontinued

Plaintiff's narcotics prescriptions in light of Plaintiff's cocaine use. *Id*.

On May 10, 2010, Plaintiff returned to Dr. Huckell with complaints of neck pain

radiating to Plaintiff's left shoulder, left arm and finger numbness, tingling and

clumsiness, but no loss of balance or coordination while walking. (R. 643). Dr. Huckell

referred Plaintiff to chiropractic treatment indefinitely and opined Plaintiff remained

disabled.  (R. 646).

On May 12, 2010, Dr. Williams noted Plaintiff expressed she was unable to do anything because of pain.  (R. 677).  Dr. Williams refilled Plaintiff's prescription for Neurontin (seizures), prescribed Lexapro (antidepressant) and naproxen (arthritis), and opined Plaintiff remained totally disabled.  *Id*.

On May 22, 2010, Plaintiff sought treatment from Buffalo General Hospital for shoulder pain and received a bronchial inhaler for wheezing and a prescription for Lortab.  (R. 687).  On July 19, 2010, Plaintiff visited a Sheehan Health Network clinic seeking to refill Plaintiff's Xanax and Lortab prescriptions.  (R. 715).  Practitioner notes from the visit describe Plaintiff as "very defensive when discussing pain meds," and note that Plaintiff was upset and left the clinic without medication.  (R. 716).  On August 27, 2010, Plaintiff returned to the clinic with left shoulder pain.  (R. 717).  Practitioner notes from the visit describe Plaintiff as "crazy" "very upset" and "anxious" at the death of her brother who was to be buried that day.  *Id*.  On September 1, 2010, Antonia Redhead, M.D. ("Dr. Redhead"), a physician at the Sheehan health clinic, assessed Plaintiff with rotator cuff tendinitis, neck pain, depression and anxiety, and prescribed Xanax to relieve Plaintiff's anxiety symptoms.  (R. 719).  On October 8, 2010, Plaintiff returned to Dr. Redhead with cold symptoms, chest pain, depression, and back and shoulder pain that Plaintiff rated as a 7 on a ten point scale.  (R. 720).  Dr. Redhead diagnosed Plaintiff with bronchitis, musculoskeletal pain, left shoulder rotator cuff tendonitis, cervicalgia (neck pain that does not radiate outward), depression and anxiety, and reviewed a smoking cessation plan with Plaintiff.  (R. 721).  On November 8, 2010, Plaintiff returned to Dr. Redhead with a productive cough and left shoulder

pain, leading Dr. Redhead to diagnosis Plaintiff with bronchitis and a limited range of motion of Plaintiff's left shoulder.  (R. 723-24).

At the administrative hearing held on April 11, 2011 (R. 25), Plaintiff testified she is unable to socialize, shop, dress or bathe without assistance, prepare meals properly, babysit her grandsons, go anywhere, or do anything.  (R. 39-40).  Plaintiff further testified she experiences constant pain in the lower back, body stiffness from the neck down, is unable to kneel or squat, or move on some days, has difficulty turning her head and sleeping, is able to sit for 15 minutes to one half an hour at a time, able to stand for 20 minutes at a time, and experiences fatigue throughout much of the day. (R. 40-48).

## DISCUSSION

**1.     Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . ..  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past relevant work, the burden shifts to the Commissioner to prove there is

alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir. 1980).

A.    **Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas,* 712 F.2d at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[9]

---

[9] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the

if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must follow in determining eligibility for disability insurance benefits. 20 C.F.R. §§ 404.1520 and 416.920. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982). The first step is to determine whether the applicant is engaged in substantial gainful activity during the period for which benefits are claimed. 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.* The next step is to determine whether the applicant has a severe impairment which significantly limits the physical or mental ability to do basic work activities as defined in the applicable regulations. 20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent an impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[10] 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646

---

Commissioner of Social Security, effective March 31, 1995.

[10] The applicant must meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry,* 675 F.2d at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [her] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. 20 C.F.R. §§ 404.1520(g), 416.920(g). The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry,* 675 F2d at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the decision. *Richardson*, 402 U.S. at 410.

**B.** **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it

includes less responsibility or pay than work previously performed. 20 C.F.R. §
404.1572(a). Earnings may also determine engagement in substantial gainful activity.
20 C.F.R. § 404.1574. In this case, the ALJ concluded Plaintiff did not engage in
substantial gainful activity since December 9, 2008, the onset date of the alleged
disability. (R. 18). Plaintiff does not contest this determination.

**C.** **Severe Physical or Mental Impairment**

The second step of the analysis requires a determination whether Plaintiff had a
severe medically determinable physical or mental impairment that meets the duration
requirement in 20 C.F.R. § 404.1509 ("§ 1409") and significantly limits the Plaintiff's
ability to do "basic work activities." The Act defines "basic work activities" as "abilities
and aptitudes necessary to do most jobs," and includes physical functions like walking,
standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for
seeing, hearing, and speaking; understanding, carrying out, and remembering simple
instructions; use of judgment; responding appropriately to supervision, co-workers and
usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§
404.1521(b) ("§ 1521"), 416.921(b).

In this case, the ALJ found Plaintiff had the severe impairments of degenerative
disc disease, degenerative joint disease, left rotator cuff tendonitis, asthma and obesity
as defined under 20 C.F.R. § 404.1520(c). (R. 18). Plaintiff does not contest the ALJ's
finding that Plaintiff has such severe impairments, but contests the ALJ's finding that
Plaintiff does not have the mental impairments of depression or anxiety either alone or
in combination with Plaintiff's other severe impairments. Plaintiff's Memorandum at 15.
In particular, Plaintiff alleges the ALJ failed to acknowledge the existence of Plaintiff's

mental impairments, and to provide a reason for the ALJ's finding Plaintiff's depression and anxiety were not severe, and alternatively "guessed" at the onset date of Plaintiff's mental impairments.  Plaintiff's Memorandum at 14-15.  This contention is without support of substantial evidence in the record.

Contrary to the Plaintiff's assertion otherwise, in this case the ALJ's opinion includes a discussion of Plaintiff's mental impairments of anxiety and depression.  In particular, the ALJ discussed Plaintiff's April 4, 2011 visit to Dr. Redhead, and Dr. Redhead's determination that Plaintiff's anxiety and depression cause Plaintiff to be incapable of performing even low stress jobs.  (R. 23).  Further, the ALJ specifically determined Dr. Redhead's opinion " is given little weight because it is not supported by the overall medical record."  *Id*.  Although Dr. Williams assessed Plaintiff with unspecified depressive and anxiety disorders on several dates, Plaintiff's Memorandum at 14 (citing R. at 667-69, 671, and 673), such assessments, unaccompanied by any resulting impairment to Plaintiff's ability to perform work-related activities, do not rise to the level of severity required under the Act. 20 C.F.R. § 404.1521(a) (an impairment is not severe if it does not significantly limit a disability claimant's mental ability to do basic work activities including understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, and dealing with changes in a routine work setting).  Notably, Dr. Williams is not a psychiatrist or psychologist, and nothing in the record establishes Dr. Redhead's determination Plaintiff exhibited signs of anxiety and depression on August 18, 2010, was in response to Plaintiff's visit for pain medication refills, where upon Dr. Redhead's recommendation that Plaintiff pursue alternatives to pain medication, Plaintiff left Dr. Redhead's office

upset and without examination.  (R. 717).  Furthermore, on August 27, 2010, Dr.

Redhead first prescribed anxiety medication in response to Plaintiff being upset about

the death and burial of her brother, not as treatment for a severe mental impairment as

Plaintiff suggests.  (R. 717).  Nothing in the record suggests that any of Plaintiff's

treating or non-treating physicians believed Plaintiff's anxiety or depression warranted

psychiatric evaluation or treatment or so adversely affect Plaintiff's activities as to rise to

the level of a severe mental impairment 20 C.F.R. § 404.1521(a) (an impairment or

combination of impairments is not severe if it does not significantly limit your physical or

mental ability to do basic work activities); 42 U.S.C. § 423(d)(3) (a physical or mental

impairment is an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical

and laboratory diagnostic techniques).  As such, the ALJ's determination Plaintiff's

mental impairment is not severe is supported by substantial evidence in the record.

**D.**     **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments

are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of

Impairments").  If the impairments are listed in the Appendix, and the duration

requirement is satisfied, the impairment or impairments are considered severe enough

to prevent the claimant from performing any gainful activity and the claimant is

considered disabled.  20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d.

45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed

impairments, the claimant is considered disabled").  The relevant listing of impairments

in this case includes 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.02 ("§ 1.02") (Major

dysfunction of a joint), § 1.04 ("§ 1.04") (Disorders of the spine), § 3.00 ("§ 3.00") (Respiratory system), § 12.04 (" § 12.04") (Affective Disorders), and § 12.06 ("§ 12.06") (Anxiety Related Disorders).

Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes, and may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events. C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00A. In considering whether a plaintiff is disabled by a disorder of the musculoskeletal system, loss of function may result from bone or joint deformity, or destruction from any cause, miscellaneous disorders of the spine with or without radiculopathy, or other neurological deficits, 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00B1 ("§ 1.00B1"), *and* must be accompanied by either an inability to ambulate effectively, or to perform fine and gross motor movements. *Id.*, 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00B2a ("§ 1.00B2a"). The inability to ambulate effectively or perform fine and gross movements must have lasted for at least twelve months, and is defined as "an extreme limitation of the ability to walk, (for example an impairment that interferes very seriously with an individual's ability to initiate, sustain, or complete activities)." 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00B2b(1) ("§ 1.00B2b(1)").

Here, the record supports the ALJ's determination that although Plaintiff has degenerative joint disease of the left knee and degenerative disc disease of the lumbar spine, neither impairment meets the severity of criteria required under the Listing of impairments because Plaintiff remains able to ambulate as defined under § 1.00B2b(1), and to perform fine and gross movements as defined under 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00B2c ("§ 1.00B2c").

**1. Major dysfunction of a joint - left knee**

Relevant to Plaintiff's left knee, disability under 20 C.F.R. Pt. 404, Subt. P,

Appendix 1, § 1.02 (Major dysfunction of a joint) is characterized by

> gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous
> ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of
> motion or other abnormal motion of the affected joint(s), and findings on
> appropriate medically acceptable imaging of joint space narrowing, bony
> destruction, or ankylosis of the affected joint(s). With: (A) involvement of one
> major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in
> inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

As stated, Discussion, *supra*, at 19, the ALJ found, and Plaintiff does not dispute that

Plaintiff has left knee degenerative joint disease and left rotator cuff tendonitis.

Nevertheless, to meet the criteria for disability based on major dysfunction of a joint,

Plaintiff must also show loss of function defined as "the inability to ambulate effectively

on a sustained basis for any reason, including pain associated with the underlying

musculoskeletal impairment, or the inability to perform fine and gross movements

effectively on a sustained basis for any reason including pain associated with the

underlying musculoskeletal impairment." § 1.00B2a.

Here, the record establishes Plaintiff's left knee injury did not result in Plaintiff's

inability to ambulate effectively as required under 20 C.F.R. Pt. 404, Subpt. P, App. 1

§1.00B2b(1). Inability to ambulate means "an extreme limitation of the ability to walk;

*i.e.*, an impairment(s) that interferes very seriously with the individual's ability to

independently initiate, sustain, or complete activities." *Id*. In contrast, to ambulate

effectively, individuals must

> be capable of sustaining a reasonable walking pace over a sufficient distance to

be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school . . . examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping, and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 1.00B2b(2).

In the instant case, substantial evidence supports the ALJ's determination that Plaintiff is able to ambulate effectively as defined under § 1.00B2b(2).  In particular, on May 7, 2010, Dr. Huckell opined Plaintiff had "improved significantly since the last visit and is able to walk in a normal fashion." (R. 563).  Plaintiff testified she rode the bus unaccompanied to the disability hearing held on April 11, 2011.  (R. 34).  Plaintiff further testified that she is able to walk for two blocks without needing to rest (R. 43), has the ability to go grocery shopping (R. 36), and attends school classes on a daily basis (R. 195).  The record thus establishes Plaintiff is able to ambulate effectively as defined under § 1.00B2b(2), and Plaintiff is therefore not able to meet the criteria under § 1.02 (disability relative to major dysfunction of a joint) based on left knee degenerative disease.

## 2. Major dysfunction of a joint - left shoulder

Severity of impairment relative to a disability claimant's shoulder impairment is determined using the criteria under § 1.02, Discussion, *supra*, at 23, and includes the involvement of one major peripheral joint in each upper extremity (*i.e*., shoulder, elbow or wrist-hand), resulting in an inability to perform fine and gross movements effectively under 20 C.F.R. Pt. 404, Subt. P, App. 1 § 1.00B2c ("§ 1.00B2c").  20 C.F.R. Pt. 404,

Subpt. P, App. 1 § 1.02B ("§ 1,02B").  In the instant case, Plaintiff was diagnosed with stiffness of the left shoulder, rotator cuff tendonitis, posttraumatic AC joint arthrosis, cervicalgia, and labral tear.

The ALJ determined, and Plaintiff does not dispute Plaintiff's shoulder impairment meets the criteria under § 1.02 (gross anatomical deformity characterized by chronic joint pain and stiffness with signs of limitation of motion and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis).

To be found disabled under § 1.02 however, a disability claimant must also exhibit an inability to perform fine and gross motor skills effectively.  Inability to perform fine and gross motor skills effectively as a basis for disability resulting from a musculoskeletal impairment is defined as

> an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subt. P, App. 1 § 1.00B2c.

Here, no evidence in the record suggests Plaintiff is unable to perform fine and gross motor skills effectively as defined under § 1.00B2c.

In particular, on December 10, 2009, Dr. Balderman noted Plaintiff was able to bathe and dress herself, that Plaintiff's hand and finger dexterity were intact, and that Plaintiff's marked limitations in reaching, pushing, and pulling related to Plaintiff's recent shoulder surgery would resolve within four months following Plaintiff's shoulder surgery. (R. 504). On January 15, 2010, Dr. Tetro reported Plaintiff continued to experience shoulder pain, but that Plaintiff reported improved range of motion and strength of Plaintiff's left shoulder. (R. 617). Further, insofar as Plaintiff testified she "can't do a lot of reaching . . . can't do a lot of pulling . . . [and is] unable to carry things like [she] used to " (R. 37), but that she is able to brush her teeth, prepare meals, go to the store and bathe, requires assistance getting out of the tub, and is unable to comb her hair like she used to, (R. 36-37), assuming *arguendo*, such assertions accurately reflect Plaintiff's physical limitations, the need for assistance with such activities of daily living does not arise to an inability to effectively perform fine and gross motor skills as defined under § 1.00B2c. That Plaintiff's left shoulder impairment does meet the criteria necessary to establish disability under § 1.00B2c, requires finding Plaintiff is not disabled under § 1.02B.

**3. Disorders of the spine**

According to Section 1.04 of the Listing of Impairments, a person may be disabled based on disorders of the spine if medical evidence demonstrates herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal cord, and is accompanied by one of the following:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04.

Disability based on a disorder of the spine, however, also requires an inability to ambulate effectively or to perform fine and gross motor skills, as defined respectively under § 1.00B2b and § 1.00B2c. In the instant case, the ALJ determined, and Plaintiff does not dispute that Plaintiff has degenerative disc disease of the spine (R. 18). As previously discussed however, Discussion, *supra*, at 25-26, Plaintiff's lumbar injury does not result in Plaintiff's inability to ambulate effectively as required under § 1.00B2b(2), or to perform fine and gross motor skills under § 1.00B2c, and Plaintiff is therefore not disabled under § 1.04 (disorders of the spine).

**4. Mental Impairment**

Plaintiff contends that the ALJ's disability determination fails to include consideration of whether Plaintiff's depression and anxiety, alone or in combination with Plaintiff's other listed impairments was a severe impairment, and thereby results in a substitution of the ALJ's own opinion for the medical evidence in the record. Plaintiff's Memorandum at 15. Plaintiff's argument is contrary to evidence in the record. In particular, the ALJ's decision includes a determination that Dr. Redhead's opinion Plaintiff was incapable of even low stress jobs as a result of Plaintiff's pain and anxiety was without support of medical evidence in the record. (R. 23). Nor did the ALJ violate the treating physician's rule in assigning "little weight" to Dr. Redhead's opinion. In particular, the record is devoid of any evidence establishing Plaintiff meets the listed criteria for disability based on depression (§ 12.04) or anxiety (§ 12.06). None of Plaintiff's treating or non-treating physicians recommended Plaintiff seek psychological treatment or counseling, and none of Plaintiff's treating physicians providing treatment for other injuries sustained by Plaintiff from the accident on December 9, 2008, diagnosed Plaintiff with either depression or anxiety. (R. 242-465). On August 28, 2009, Dr. William's completed an initial comprehensive medical evaluation on Plaintiff and noted Plaintiff exhibited no symptoms of anxiety or depression. (R. 650-52).

Notably, the first indication in the record that Plaintiff claimed to be suffering from depression was on a disability report completed by Plaintiff, herself, on October 29, 2009, wherein Plaintiff noted "occasional depression" as an illness that limits Plaintiff's ability to work. (R. 183). On December 18, 2009, and January 5, 2010, Nurse Practitioner Melendez ("Nurse Practitioner Melendez"), a nurse practitioner in Dr. Williams's office, noted Plaintiff was anxious, irritable and sad, but otherwise displayed

normal affect.  (R. 662-65).  On April 13, 2010, Dr. Williams noted Plaintiff was very

anxious from lack of sleep as a result of pain (R. 673), and on April 27, 2009, noted

Plaintiff tested positive for cocaine and discontinued Plaintiff's narcotic pain

medications.  (R. 676).  The first indication Plaintiff actually exhibited any symptoms of

depression was on July 19, 2010, when Plaintiff visited Dr. Redhead seeking new pain

medication (R. 711), and Dr. Redhead noted depression and anxiety in a

comprehensive list of Plaintiff's health history, and prescribed Lexapro for Plaintiff's

depression and Xanax for Plaintiff's anxiety.  (R. 712).  On August 27, 2010, during a

telephone conversation with Plaintiff, Dr. Redhead noted Plaintiff's brother had died,

that Plaintiff was very upset, "crazy," and very anxious, and prescribed Xanax to

alleviate Plaintiff's anxiety.  (R. 717).  On October 6, 2010, Dr. Redhead noted Plaintiff

experienced "continued moments of depression" and anxiety, but did not refer Plaintiff

for psychiatric treatment or counseling.  (R. 720).  On November 8, 2010, Dr. Redhead

noted Plaintiff was oriented to time, place and person, and was in fair spirits with some

anxiety  (R. 724), and on December 8, 2010, exhibited some anxiety.  (R. 726).  On

April 4, 2011, Dr. Redhead completed a residual functional capacity questionnaire and

noted Plaintiff's pain and anxiety make Plaintiff incapable of even low stress jobs. (R.

780).  None of Plaintiff's treating physicians diagnosed Plaintiff with depression or

anxiety prior to Dr. Redhead's prescribing Xanax on August 27, 2010, in response to

anxiety brought on by Plaintiff's response to the death of Plaintiff's brother.  (R. 717).

Accordingly, the ALJ's determination Plaintiff did not have the severe mental

impairment*s* of anxiety or depression is supported by evidence in the record and as

such, the ALJ was not required to include anxiety and depression in the remaining

steps of the disability review analysis.  20 C.F.R. § 404.1508.

Plaintiff further contends the ALJ "guessed at the onset date," of Plaintiff's mental impairment without reliance on medical opinion as required under Social Security Ruling 83-20 ("SSR 82-30").  Plaintiff's Memorandum at 15.  This contention is also without merit.

 Factors relevant to a determination of a disability claimant's onset date include the individual's allegation, the work history, and the medical evidence.  SSR 83-20.  In this case, the ALJ established Plaintiff's disability onset date as December 9, 2008 (R. 18), the date Plaintiff included as the disability onset date on Plaintiff's application for disability benefits, the date of the accident suffered by Plaintiff, and the last date that Plaintiff was able to engage in substantial activity.  (R. 156).  The ALJ thus properly relied on the relevant factors of SSR 83-20 in determining Plaintiff's onset date was December 9, 2008, and Plaintiff's contention otherwise is without merit.

**5. Asthma**

As discussed, Discussion, *supra*, at 19, the ALJ determined, and Plaintiff does not dispute that Plaintiff has the severe impairment of asthma.  Nothing in the record however, supports Plaintiff's asthma causes Plaintiff continuing signs and symptoms of respiratory distress despite ongoing treatment, or that Plaintiff suffers attacks under the criteria set forth under 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03B (" § 3.03B"), or 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00A ("§ 3.03A"), and Plaintiff is therefore not disabled under § 3.03B (Asthma).

**6. Credibility of Subjective Complaints**

Pain or other symptoms may also be important factors contributing to a disability claimant's functional loss. 20 C.F.R. § 404.1529(c)(3). Pain or other symptoms affect a claimant's ability to perform basic work activities if relevant medical signs or laboratory findings show the existence of a medically determinable impairment that could "reasonably" be expected to cause the associated pain or other symptoms. *Id*. Persistence and intensity of pain and other symptoms are used to determine the degree of adverse impact on an individual's functioning capacity. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00B2d.

In this case, the ALJ, as required, evaluated Plaintiff's impairment under 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, and determined that although the record supports Plaintiff has the severe impairments of degenerative disc disease, degenerative joint disease of the left knee, tendonitis of the left rotator cuff, asthma and obesity, that Plaintiff's statements concerning the intensity, persistence and limiting effects of Plaintiff's symptoms were not credible to the extent they were inconsistent with Plaintiff's residual functional capacity assessment completed on April 4, 2011. (R. 19). Plaintiff contends that the ALJ failed to properly assess Plaintiff's credibility by using the ALJ's own residual functional capacity finding, and failed to evaluate the intensity, persistence and limiting effects of Plaintiff's pain, and assess the location, duration, frequency and intensity of Plaintiff's pain on Plaintiff's ability to perform basic work activities. Plaintiff's Memorandum at 20-21. Contrary to Plaintiff's assertion, the ALJ's determination that Plaintiff's complaints regarding the intensity, persistence and limiting effects of Plaintiff's symptoms are not entirely credible is supported by the record.

In particular, Plaintiff testified she was able to attend school on a daily basis (R. 33, 195, 640), was able to bathe, prepare meals, go grocery shopping with assistance (R. 36), and walk for a distance of two blocks at a time. (R. 43). On May 8, 2009, Dr. Huckell assessed Plaintiff with painless motion of the left hip, tenderness to palpation of the left knee, normal left knee X-ray and MRI test results and diagnosed Plaintiff with mild osteoarthritis of the left knee. (R. 562). On September 24, 2009, Plaintiff exhibited normal range of motion of the lumbar spine, elbows, wrists, hips, knees, and ankles (R. 481), and on December 10, 2009, Dr. Balderman noted Plaintiff exhibited full range of motion of the hips, knees, right shoulder, and ankles. (R. 505). On December 15, 2009, Dr. Liebman reviewed an X-ray of Plaintiff's left knee that was normal. (R. 505). An X-ray of Plaintiff's lumbar spine taken the same day also showed normal results. (R. 506). On February 9, 2010, Dr. Huckell assessed Plaintiff with a steady gait and the ability to stand on her heels and toes, with normal range of motion of Plaintiff's shoulders, elbows, wrists, hips, knees, and ankles. (R. 634). On March 31, 2010, Plaintiff was discharged from physical therapy for a return to daily/functional activities without pain or restriction. (R. 641). On May 4, 2010, Dr. Huckell opined Plaintiff was tolerating her symptoms of neck pain with chiropractic treatment (R. 646) and on May 7, 2010, noted Plaintiff had improved significantly and was able to walk in a normal fashion. (R. 563). The ALJ's determination that Plaintiff's statements concerning the intensity, persistence and limiting effects of Plaintiff's symptoms are not credible is thus supported by medical evidence in the record in accordance with 20 C.F.R. § 404.1529, and the court will not disturb such finding.

As the matter is before the undersigned for a report and recommendation,

however, the court considers whether the ALJ properly evaluated Plaintiff's disability claim under the remaining two steps of the analysis. The ALJ next considered whether Plaintiff, despite suffering from degenerative disc disease, degenerative joint disease, left rotator cuff tendonitis, asthma and obesity, which neither met nor equaled any listed impairment, nevertheless retained the residual functional capacity to perform a range of sedentary work. (R. 19-20).

### E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms. 20 C.F.R. § 416.945(a). If a claimant's residual functional capacity is insufficient to allow the performance of past relevant work, the ALJ must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.1560(3)(c).

Here, the ALJ determined Plaintiff has the residual functional capacity to perform light work with the restrictions of no pushing, pulling, or reaching with the upper left extremity, no climbing of ladders, ropes or scaffolding, occasional climbing of stairs and ramps, occasional kneeling, stooping, crouching, and crawling, avoid concentrated exposure to environmental irritants, concentrated use of heavy moving machinery and exposure to unprotected heights, limited to understanding, remembering and carrying out simple instructions, but able to make judgments on simple work-related decisions. (R. 19). Plaintiff contends the ALJ violated the treating physician rule by not assigning

proper weight to the results of Dr. Redhead's residual functional capacity examination of Plaintiff conducted on April 4, 2011.  Plaintiff's Memorandum at 18.  Plaintiff further contends that the ALJ's failure to assign proper weight to Dr. Redhead's opinion constitutes improper substitution of the ALJ's opinion for the opinion of Dr. Redhead. *Id*.  This is contrary to evidence in the record.

The treating physician's rule requires the ALJ give a treating physician's opinion "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  In particular, the Act provides

> [g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *Clark v. Commissioner of Soc. Sec.*, 143 F.3d. 115, 118 (2d Cir. 1998).  The regulations define "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] ... with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §404.1502.  Certain factors must be considered by the court in determining whether an ALJ correctly refused to give the

treating physician's opinion controlling weight. These factors include: "i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark* 143 F.3d. at 118. Generally, the longer a claimant is treated and seen by a treating source, the more weight is to be afforded by the ALJ to the treating source's medical opinion, 20 C.F.R. § 404.1527(d)(2) ("§ 404.1527(d)(2)"), and added weight is given to specialist opinions and opinions supported by laboratory tests 20 C.F.R. § 404.1527(d)(5).

In this case, Plaintiff's continuing treatment from Drs. Huckell, Tetro, and Williams, and the frequency and nature of the doctors' multiple examinations and treatment establish that Drs. Huckell, Tetro, and Williams are Plaintiff's treating physicians under 20 C.F.R. § 404.1527(d)(2)(i) (the longer and more frequently a treating source treats a disability claimant the more weight will be given the source's medical opinion). In particular, Dr. Huckell examined Plaintiff on February 9, 2009, and diagnosed Plaintiff with mild osteoarthritis (R. 471-73) and examined Plaintiff on February 19, 2009 (R. 473), September 24, 2009 (R. 486), July 27, 2009 (R. 575), January 25, 2010 (R. 524), February 9, 2010 (R. 632), May 4, 2010 (R. 562), May 8, 2010 (R. 646), and May 10, 2010 (R. 543). Plaintiff's visits to Dr. Huckell included a physical examination and assessment of Plaintiff's musculoskeletal system including Plaintiff's shoulders, neck, knees, and cervical and lumbar spine. *Id*.

Dr. Tetro completed a consultative examination on Plaintiff on September 23, 2009 (R. 474), performed shoulder surgery on Plaintiff on November 23, 2010 (R. 603), and examined Plaintiff postoperatively on January 15, 2010 (R. 617), and February 5,

2010 (R. 628).  Dr. Williams provided pain management treatment for Plaintiff on August 8, 2009 (R. 650), October 23, 2009 (R. 661), January 5, 2010 (R. 664), February 10, 2010 (R. 667), March 12, 2010 (R. 678), April 13, 2010 (R. 673), and May 12, 2010 (R. 677).  The medical opinions of Drs. Huckell, Tetro, and also are supported by medically acceptable clinical and laboratory diagnostic techniques including an MRI scan of Plaintiff's left shoulder on February 28, 2009 (R. 250), MRI scan of Plaintiff's lumbar spine on April 28, 2009 (R. 484), X-rays of Plaintiff's left knee on February 19, 2009 (R. 471-73), May 8, 2009 (R. 562), December 10, 2009 (R. 507), an X-ray of Plaintiff's left shoulder on January 15, 2010 (R. 619), and an MRI scan of Plaintiff's cervical spine on February 9, 2010 (R. 632).  The ALJ's determination to assign more weight to the treating physician opinions of Drs. Huckell, Tetro, and Williams than Dr. Redhead's is thus supported by evidence in the record and in accordance with the requirements of § 404.1527(2)(d)(ii) (more weight is given treatment source opinions based on medical signs and laboratory findings).

The Plaintiff correctly asserts, Plaintiff's Memorandum at 19 (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), *McBraver v. Secretary of Health and Human Services*, 712 F.3d 795, 799 (2d Cir. 1983)*, Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), that the ALJ is not allowed to substitute his own expertise against that of a physician.  Nevertheless, the ALJ's determination Dr. Redhead's opinion is not supported by the medical record (R. 23), is in accordance with 20 C.F.R. § 404.927(d)(2)(ii)(3) (the more a medical source is supported by relevant evidence, the more weight will be assigned to the opinion).  In particular, Plaintiff was referred to Dr. Redhead for examination upon the expiration of Plaintiff's no-fault insurance and

Plaintiff was no longer able to receive treatment for her injuries resulting from the accident from Dr. Huckell and Dr. Tetro. (R. 759). The record reveals Plaintiff visited Dr. Redhead on a monthly basis from July 19, 2010 (R. 711) until March 4, 2011 (R.774), however, Plaintiff's appointments were denoted as prescription re-fills, and do not reveal whether Dr. Redhead reviewed Plaintiff's X-rays or MRI scans to support Dr. Redhead's functional assessment of Plaintiff. Thus, Dr. Redhead's opinion that Plaintiff's depression established Plaintiff's disability, Discussion, *supra*, at 27-29, was properly discounted by the ALJ. Alternatively, Dr. Balderman's consultative examination includes review of left knee and shoulder X-rays taken the same day (R. 505), and Dr. Balderman's opinion relies on range of motion tests closely aligned with the diagnostic techniques used by Plaintiff's treating physicians. The ALJ's determination to assign greater weight to the opinion of Dr. Balderman, and that Plaintiff's marked limitation in reaching, pushing and pulling are a result of Plaintiff's shoulder surgery, does not violate the treating physician's rule.

**F.**     **Suitable Alternative Employment in the National Economy**

Once an ALJ finds a plaintiff's impairments prevent a return to previous work, the burden shifts to the Commissioner to prove substantial gainful work exists that the plaintiff is able to perform in light of her physical capabilities, age, education, experience, and training. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *DeLeon*, 734 F.2d at 937. To make such a determination, the Commissioner must first show that the

applicant's impairment or impairments are such that they nevertheless permit certain basic work activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Id*.

An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[11] *Decker*, 647 F.2d at 294. In addition, the Commissioner must establish that the claimant's skills are transferrable to the new employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[12] *Id*. at 294. This element is particularly important in determining the second prong of the test, whether suitable employment exists in the national economy. *Id*. at 296. Where applicable, the Act's Medical-Vocational guidelines may be used to meet the Secretary's burden of proof concerning the availability of alternative employment and

---

[11] "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[12] The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.

"Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs."
20 C.F.R. § 404.1568(a).

"Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. § 404.1568(b).

supersede the requirement of vocational expert testimony regarding specific jobs a claimant may be able to perform in the regional or national economy. *Heckler v. Campbell*, 461 U.S. 458, 462 (1983).

In instances where nonexertional limitations diminish a claimant's ability to perform the full range of "light" work, the ALJ should require the Secretary to solicit testimony from a vocational expert regarding the availability of jobs in the national and regional economies suitable for employment of an individual with exertional and nonexertional limitations similar in nature to the claimant's. *Bapp v. Bowen*, 802 F.2d 606, 501 (2d Cir. 1986). Following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Lawler v. Astrue*, 2013 WL 656740, at *3 (2d Cir. February 25, 2013) (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting, *Bapp,* 802 F.2d at 605)). The Act requires the ALJ use the same residual functional capacity assessment used to determine if a claimant can perform past relevant work when assessing a claimant's ability to perform other work. 20 C.F.R. § 404.1550(c)(2). "Hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (citing *Gamer v. Secretary of Health and Human Services*, 815 F.2d 1275, 1279 (9th Cir. 1987)). ALJ's are required to provide, at a minimum, the reasons for their decisions, *Connor*, 900 F. Supp. 994, 1003 (N.D.Ill. 1995) (citing *Diaz v. Chater*, 55 F. 3d 300, 307 (7th Cir. 1995)),

and remand is proper for consideration of additional evidence not previously addressed. 42 U.S.C. § 405(g), *Connor*, 900 F. 2d at 1004 (remand where ALJ failed to consider entirety of VE's testimony).

Here, the ALJ posed hypothetical exertional and nonexertional limitations to the VE related to Plaintiff's limitations (R. 53-57), and the VE reviewed Plaintiff's credentials and limitations, and concluded that substantial gainful employment opportunities exist that an individual of the same age and education as Plaintiff, who was capable of, at most, light and/or sedentary exertion, was capable of performing. (R. 27). The ALJ posed a hypothetical situation to the VE that included limitations particular to Plaintiff, including, no pushing or pulling or overhead reaching with the left extremity, no climbing ladders or scaffolds, occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling, avoid concentrated exposure to environmental irritants, use of moving machinery and exposure to unprotected heights. (R. 54). The VE opined that Plaintiff, including the limitations posed by the ALJ to the VE, would be capable of performing the positions of data entry clerk and office helper as a cashier II (skilled, light) with 3,500,000 positions in the national economy, and 105,000 positions in New York State; parking lot attendant (light) with 131,000 positions in the national economy, and 4,000 in New York State; small parts assembler (light) with 281,000 positions in the national economy, and 3,000 positions in New York State. (R. 55). The ALJ changed the hypothetical to include limitation to understanding, carrying out and remembering simple instructions, able to make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers in routine work settlings, respond to usual work situations and changes in routine work setting, which the VE opined would

result in Plaintiff's ability to perform Plaintiff's past relevant work as a data entry clerk (light).  *Id*.  The ALJ then included the same hypothetical at the sedentary exertion level, and the VE opined Plaintiff would be able to perform Plaintiff's past relevant work as a data entry clerk and office helper.  *Id*.  Consistent with Plaintiff's subjective complaints, which the ALJ determined were not credible, Discussion, *supra* at 30-32, the ALJ added to the hypothetical the ability to stand for two hours total in an 8 hour work day, and sit for 4 hours in an 8 hour work day, with the remainder of the work day in a reclined position, to which the VE opined would result in Plaintiff not being able to perform Plaintiff's past work.  (R. 57).  Lastly, the ALJ changed the hypothetical to include inability to type from limited ability to grasp and move fingers, or absent two or more times per month, a hypothetical to which the ALJ opined would result in an inability for Plaintiff to engage in Plaintiff's past relevant employment as data entry clerk and office helper.  (R. 58).

As such, the ALJ's determination Plaintiff was capable of performing Plaintiff's past relevant work based on hypothetical questions submitted to the VE that included all of Plaintiff's impairments, including Plaintiff's limited ability to reach, pull, and push overhead with Plaintiff's upper left extremity is supported by substantial evidence and does not require remand.

## **CONCLUSION**

Based on the foregoing, Defendant's motion should be GRANTED, and the Clerk

of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO

UNITED STATES MAGISTRATE JUDGE

DATED:    June 4, 2013

             Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 4, 2013
            Buffalo, New York